# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| JOSEPH F. SANTORE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 11 C 7391 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | Judge John Z. Lee |
| of the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Joseph F. Santore seeks judicial review of a decision by Defendant Michael J. Astrue, former Commissioner of the Social Security Administration, denying his application for disability insurance benefits. Santore filed a motion for summary judgment, asking the Court to reverse the decision of the Administrative Law Judge ("ALJ") denying him benefits or, alternatively, to remand for further proceedings. For the reasons discussed herein, the Court grants Santore's motion for summary judgment in part and remands for further proceedings consistent with this Order.

## Procedural History

On November 16, 2007, Santore applied for disability insurance benefits, alleging that he had become disabled as of August 7, 2007. Administrative Record ("Admin. R.") 145. Santore's claims were denied, and reconsideration was likewise denied. *Id.* 89–101. Santore then requested a hearing before an ALJ, who also denied his claims. *Id.* 102. The ALJ found that, while Santore had at least one medically determinable "severe" impairment or its equivalent, his physical and mental impairments did not satisfy the criteria in the Listing of

Impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* 17–18. Furthermore, the ALJ found that Santore had the residual functional capacity to perform a range of unskilled, light work and therefore was not "under a disability" or "disabled" for purposes of receiving disability insurance benefits. *Id.* 18–22. The Appeals Council denied Santore's request for review. *Id*. 1–3. Santore now seeks review by this Court.

### Factual Background

Joseph Santore, born August 25, 1955, was fifty-three years old on the date of the hearing. *Id*. 14, 148. Santore has an eighth-grade education, *id*. 193, and worked as a printer from October 1988 through August 2007. *Id*. 175. He left his job on August 7, 2007, and as explained in the "Disability Report" section of his November 16, 2007, application for Disability Insurance Benefits, he "[could not] do [his] job as a printer anymore" because "[t]he chemicals and lifting make it very difficult." *Id*. 187. He further explained that he "missed a lot of work because of pain, depression, fatigue, and a bad back," and also complained of breathing and heart problems. *Id*. Prior to leaving his job in August 2007, Santore received medical care for both physical and mental ailments.

### I.    Medical Evidence

The record contains numerous medical evaluations describing Santore's physical and mental condition. All of them suggest at least some degree of limitation, but the most recent evaluations—those conducted by Santore's treating physicians—paint the most severe picture, essentially stating that Santore is disabled and unable to work.

Santore's physical symptoms included breathing difficulties and pain in his back and extremities. In January 2007, Santore required emergency room care for acute cardiovascular symptoms, specifically bradycardia. *Id*. 286. On the same day, he signed a hospital record form

noting his chief complaint and mechanism of injury as a panic attack. *Id*. 299. In June 2007, Dr. Helen Ho gave a diagnostic impression of pulmonary emphysema with scarring, noting that Santore's lungs were clear. *Id*. 413.

As for Santore's back pain, in May 2007, Dr. John Ciemens made a diagnostic impression of "[m]ild diffusely bulging discs" and "[s]uggestion of small annular tear." *Id*. 417. The next year, in January 2008, Dr. Sandra Hare examined Santore, who again complained of chronic back pain. Dr. Hare concluded that Santore was able to bear his own weight, walk fifty feet without difficulty, and grasp with both hands. *Id*. 360. Her clinical findings detailed a possible left lumbar radiculopathy, probable emphysema, chronic bronchitis, recent acute bronchitis, a history of polysubstance abuse, intravenous drug abuse, and a history of depression and panic. *Id*.

The following month, Dr. Bharati Jhaveri, a state agency reviewing physician, evaluated Santore's physical condition. *Id*. 380–87. Dr. Jhaveri concluded that Santore was capable of lifting, carrying, pushing, or pulling up to fifty pounds occasionally, and sitting, standing, or walking for six hours in a normal eight-hour workday. *Id*. 381. He noted that Santore complained of emphysema, fatigue, depression, headaches, and chronic back problems, and stated that Santore's "allegations are supported by the objective evidence in file." *Id*. 387.

Several months later, in August 2008, Santore received a more limiting diagnosis from Dr. Hillary Neybert, who assessed Santore's functional capacity with respect to his claimed physical ailments. *Id*. 479. She found that Santore could lift or carry up to ten pounds occasionally and sit or walk for about two hours in a normal eight-hour workday, but that Santore was "unable to work." *Id*. 479–85.

Santore also consulted with various physicians regarding his claimed mental impairment. In April 2007, he met with Dr. Venus Paxton of Lutheran Social Services of Illinois for a psychiatric evaluation. *Id*. 318–20. Dr. Paxton diagnosed major depressive disorder, recurrent and severe without psychotic features, and noted a depressed mood with constricted affect, decreased speech, and fair insight and judgment. *Id*. 319.

Santore received two additional consultations in early 2008. Dr. Henry Fine examined Santore in January 2008, observing that Santore's "[p]osture and gait were normal," and diagnosed him with major depression recurrent with anxiety, mild psychotic features, polysubstance abuse in remission, emphysema, and chronic bronchitis. *Id*. 349. Dr. Fine noted that Santore had decreased focus, concentration and comprehension; recent memory deficit and judgment problems; a depressed and fixed affect; slowed speech; psychomotor retardation; and disorientation at times. *Id*. 349. In February 2008, Dr. Terry Travis, the state agency reviewing psychiatrist, found that Santore was "cognitively intact," could "learn simple instructions" and was "able to do 1-2 step tasks that can be learned within a month in a routine work setting." *Id*. 378. Dr. Travis assessed Santore's "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" as "[m]oderately [l]imited." *Id*. 377.

Later findings were more severe. In February 2009, when Dr. Victoria Erhardt assessed Santore's functional capacity with respect to his alleged mental impairments, she noted signs and symptoms of poor memory, appetite disturbance with weight change, sleep disturbance, mood disturbance, anhedonia or pervasive loss of interest, hypoactive sad mood, psychomotor retardation, slow nonspontaneous speech, difficulty thinking or concentrating, passive suicide ideation, social withdrawal or isolation, poor attention, and decreased energy. *Id*. 487. Santore's

prognosis was "poor," *id*. 488, and Dr. Erhardt indicated "continual" "[e]pisodes of deterioration or decompensation in work or work-like settings that cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms." *Id*. 490. Her assessment of Santore's ability to "[c]omplete a normal workday and work week without interruptions from psychologically based symptoms" was "Poor/None." *Id*. 489.

## II.   The August 4, 2009, Hearing

Dr. Bernard Stevens and Dr. Kathleen O'Brien testified as impartial medical experts at the August 4, 2009, administrative hearing. *Id*. 29–84. Both physicians evaluated the evidentiary record, including Santore's testimony. Dr. Stevens concluded that Santore was capable of performing "light work," *id*. 42, and Dr. O'Brien concluded that Santore could perform "simple, unskilled kinds of tasks." *Id*. 39. Dr. Stevens acknowledged that a small annular tear with a disk bulge could "absolutely" cause pain. *Id*. 43.

At the hearing, the ALJ asked the vocational expert whether Santore could perform his past work if his condition was consistent with the functional capacity opinions offered by the medical experts at the hearing. *Id*. 78. The vocational expert testified that Santore could not perform his past relevant work but could perform other jobs, including work as a machine loader/unloader of which 1,500 positions were available; sorter, of which 5,900 positions were available; and housekeeper, of which 10,000 positions were available. *Id*. 79. The vocational expert also testified that if a hypothetical individual could only lift ten pounds "occasionally," that individual would be limited to sedentary jobs. *Id*. 82.

## Standard of Review

Once the Appeals Council denies a petition for review of a decision by an ALJ, the ALJ's decision becomes the final decision of the Commissioner and is subject to judicial review. *See*

20 C.F.R. §§ 404.981, 416.1481; 42 U.S.C. § 405(g). A reviewing court will reverse the decision only if it is not supported by substantial evidence or is based upon an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). Substantial evidence, while less than a preponderance of evidence, consists of more than a "mere scintilla" of evidence; it requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005). If substantial evidence supports the ALJ's decision, the reviewing court must affirm that decision—even if reasonable minds could differ as to the ALJ's findings. *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). That said, if the ALJ makes an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

In making its determination, the reviewing court must consider the entire administrative record, but it may not reconsider facts, reweigh the evidence, resolve conflicts in the evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999).

When preparing the decision, the ALJ must articulate his or her analysis of the evidence so that the reviewing court "may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *see also Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). The ALJ is not required to address "every piece of evidence or testimony in the

record," but "the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001).

To be eligible for disability benefits, a claimant must establish that he or she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). For a claimant to be found disabled, the claimant's impairment must not only prevent him or her from doing his previous work; "considering [the claimant's] age, education, and work experience," it must also prevent him or her "from engag[ing] in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1520(e)–(f), 416.920(e)–(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits.[1] As part of the inquiry, the ALJ must assess the claimant's residual functional capacity, which is "an assessment of what work-related activities the claimant can perform despite her limitations." *Young v. Barnhart*, 362 F.3d

---

[1]     *First*, is the claimant engaged in substantial gainful activity? If he or she is, the claimant is not disabled, and the claim is denied; if not, the inquiry proceeds to Step 2. *Second*, does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if he or she does, the inquiry proceeds to Step 3. *Third*, does the impairment meet or equal a listed impairment in the appendix to the regulations? If it does, the claimant is automatically considered disabled; if not, the inquiry proceeds to Step 4. *Fourth*, can the claimant perform his or her past relevant work? If he or she can, the claimant is not disabled, and the claim is denied; if he or she cannot, the inquiry proceeds to Step 5. *Fifth*, can the claimant perform other work given his or her residual functional capacity, age, education and experience? If he or she can, then the claimant is not disabled, and the claim is denied; if he or she cannot, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699–700 [7th Cir. 2004]. The claimant bears the burden of proving steps one through four, while the burden of proving step five rests with the ALJ. *Zurawski*, 245 F.3d at 886; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

995, 1000 (7th Cir. 2004). The ALJ must assess the claimant's residual functional capacity based on all the relevant evidence in the record. *Id*. at 1001 (citing 20 C.F.R. § 404.1545(a)(1)).

## Analysis

Santore argues that (1) the ALJ failed to make a proper credibility finding or set forth the necessary credibility analysis; (2) the ALJ failed to properly assess Santore's concentration limitations as part of the required residual functional capacity analysis; and (3) the ALJ failed to properly weigh the opinion evidence from Santore's treating physician and treating psychiatrist. Pl.'s Mot. Summ. J. 2. The Commissioner responds that the ALJ applied the proper standards and that his findings are supported by substantial evidence. Def.'s Opp'n 5. The Court addresses each of Santore's arguments in turn.

### I.    The ALJ's Credibility Determination

Santore first argues that the ALJ failed to make a proper credibility finding, or, alternatively, that he failed to undertake a proper analysis when making it. Pl.'s Mot. Summ. J. 6; Pl.'s Reply 1. The Commissioner, on the other hand, contends that the ALJ's credibility determination was properly elaborated and therefore should not be disturbed. Def.'s Opp'n 5–8.

Under Social Security Ruling 96–7p ("SSR 96-7p"), the ALJ's determination as to a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Zurawski*, 245 F.3d at 887. Because they constitute factual findings, the ALJ's "credibility determinations are due special deference." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).

That said, the ALJ's "finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility." SSR 96-7p. When a court reviews an ALJ's credibility finding, "[b]oth the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be examined, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight." *Zurawski*, 245 F.3d at 888 (quoting *Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986)). While a reviewing court may not reweigh the evidence, it may remand if it cannot determine whether the ALJ duly examined all pertinent evidence "relat[ing] to [Plaintiff's] complaints" of symptoms. *Id*. Furthermore, when an ALJ's credibility determination rests on "objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (quoting *Clifford*, 227 F.3d at 872).

Here, after reviewing the record, the Court concludes that the ALJ's credibility finding satisfies SSR 96-7p. The ALJ found that Santore "lack[ed] veracity as a witness," because Santore had falsely represented to a clinic that he had a dependence on certain illicit drugs, after the clinic had informed him that he would not be accepted for psychiatric services without having such a dependency. Admin. R. 53; Pl.'s Mot. Summ. J. 8. The ALJ discredited Santore's testimony because Santore had "admitted lying to see a psychiatrist for the purpose of obtaining antidepressant medication." Admin. R. 21. Moreover, the ALJ reasoned that Santore's credibility "thwart[ed] reliance upon the opinions of treating medical sources when their conclusions are, apparently, based primarily upon the histories provided by the claimant." Admin. R. 21. Here, as in *Murphy v. Astrue*, 09 C 7929, 2010 WL 3516172, at *9 (N.D. Ill.

Aug. 31, 2010), *aff'd* 454 F. App'x 514 (7th Cir. 2012), "[t]he ALJ's credibility determination was specific, had an explanation, and was supported by evidence so it will not be reversed."[2]

This Court will only reverse or remand an ALJ's credibility determination if it is "patently wrong," which means "it 'lacks any explanation or support[.]'" *Williamson v. Astrue*, No. 08CV3906, 2010 WL 2858834, at *10 (N.D. Ill. July 16, 2010) (*Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir.2008)). The ALJ here articulated specific support for finding Santore less than fully credible, namely, that Santore himself admitted to lying to doctors to obtain medication.

Santore's arguments to the contrary are unpersuasive. First, Santore argues that the ALJ's decision runs afoul of *Martinez v. Astrue,* because "[t]here is no explanation of which of [Plaintiff]'s statements are not entirely credible or how credible or noncredible any of them are." 630 F.3d 693, 696 (7th Cir. 2011). But *Martinez* discussed these issues in the context of the impermissible boilerplate that the Seventh Circuit consistently rejects. *See id. Martinez* did not involve a finding of credibility based on admitted mendacity. *Cf. id.*

Santore also argues that when a "lack of candor on [one] subject reveals that [Plaintiff] is willing to lie about subjects in order to promote her self-interest," the ALJ's credibility determination must inquire into the motives or reasons for such behavior in its particular circumstances. *McClesky v. Astrue*, 606 F.3d 351, 353 (7th Cir. 2010). As an initial matter, Santore overstates the holding of *McClesky*. The Seventh Circuit did not state that the ALJ must

---

[2]      Compared to ALJ decisions in other cases that have been found wanting, the ALJ's assessment here did not rest on a desultory analysis of the medical records or a "sound-bite" approach. *Cf. Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) ("[T]he ALJ inappropriately rested his credibility determination too heavily on the absence of objective support for [claimant's] complaints without digging more deeply."); *Scrogham v. Colvin*, 765 F.3d 685, 699 (7th Cir. 2014) (credibility determination resting solely on collection of unemployment compensation at one point impermissible). Nor did the ALJ's assessment of Santore's credibility rest on naked boilerplate statements that the Seventh Circuit has repeatedly found inadequate. *See, e.g.*, *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013).

inquire into the motivations or reasons for lack of candor, but rather that the ALJ's decision made no attempt to do so. *See McClesky*, 606 F.3d at 353. Here, the ALJ did discuss motive: namely, that Santore had lied in order to obtain antidepressants and care. *See* Admin. R. 21 Furthermore, the ALJ did not come to this conclusion in a bubble, but considered other facts in the record such as "the objective clinical and laboratory findings, and symptoms that would be proportionate to them." *Id.* at 21.

Lastly, Santore contends that the ALJ violated the requirement that "an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded *solely* because they are not substantiated by objective medical evidence." SSR 97-7p (emphasis added). But the ALJ here not only considered Santore's medical history, but also found that his statements lack credibility because Santore had previously lied about his health condition in order to receive medication and treatment. Furthermore, based upon this history, the ALJ also discounted the medical evidence from Santore's treating physicians because they too relied upon Santore for an honest assessment of his condition when making their diagnosis, preferring instead to rely more upon "the objective clinical and laboratory findings." *See* Admin. R. at 21. "Where the complaints were not supported by the objective medical evidence, the ALJ was not required to rely upon [claimant's] subjective assessment of his pain." *Allen v. Astrue*, 721 F. Supp. 2d 769, 783 (N.D. Ill. 2010).

As the Seventh Circuit has held, "[a]n ALJ is in the best position to determine a witness's truthfulness and forthrightness." *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004) (citation omitted). "It is only when the ALJ's determination lacks any explanation or support that [the court] will declare it to be 'patently wrong.'" *Elder*, 529 F.3d at 413-14 (citation omitted). Because the ALJ's finding as to credibility is supported by substantial evidence in the

record, the Court cannot conclude that it was patently wrong, and remand is not required on this point.

## II.    The ALJ's Assessment of Residual Functional Capacity

Next, Santore argues that the ALJ failed to properly assess his residual functional capacity. This analysis is necessary in accordance with 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4) to determine whether a claimant, who is not deemed disabled at step three, is able to perform his or her past work (step four) or other work (step five). Pl.'s Mot. Summ. J. 11–13. In response, the Commissioner contends that the ALJ's finding as to Santore's residual functional capacity appropriately fulfilled the ALJ's obligation to determine what work Santore could perform. Def.'s Opp'n 11–14.

When evaluating the residual functional capacity of a claimant alleging a mental impairment, governing regulations mandate the application of a "special technique" to "evaluate mental impairments at steps two and three of the five-step evaluation." *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). The special technique evaluation requires a documented rating of functional limitation in four categories: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). The ALJ's decision "must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c)," using a numerical scale for each element. 20 C.F.R. §§ 404.1520a(e)(4), 404.1520a(c)(4).

The special technique is not synonymous with the residual functional capacity analysis, see *Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims,* SSR 96-8P (S.S.A. July 2, 1996). Even if the ALJ otherwise discusses a claimant's residual functional capacity in

light of evidence that would overlap with a special technique analysis, "the RFC analysis is not a substitute for the special technique[.]" *Craft*, 539 F.3d at 675.

In this case, Santore argues that the ALJ did not make specific findings in his "special technique" analysis, but simply quoted competing medical source opinions which recited the functional areas. The Commissioner concedes this point. But this concession, by itself, does not require reversal or remand, because "[u]nder some circumstances, the failure to explicitly use the special technique may indeed be harmless error." *Id.* Harmless error may arise, for example, when the ALJ's factual determinations made under an old, inapplicable standard would also compel a denial of benefits under the applicable standard. *Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003). Harmless error may also arise where, even if "the ALJ did not make explicit findings referencing the four functional areas," it is apparent from "a plain reading of the ALJ's written decision" that "the ALJ considered all the relevant information and factors required." *See Pepper v. Colvin*, 712 F.3d 351, 366 (7th Cir. 2013). Thus, a closer examination is warranted.

In his written decision, the ALJ found that Santore "has the residual functional capacity to perform a range of unskilled, light work[,]" but he failed to explicitly document or outline the special technique analysis that the regulations require. Admin. R. 18. Scanning the ALJ's decision for an implicit discussion of the "special technique" functional factors, the Court notes that the ALJ principally relied on the psychology expert. This expert opined that, "due to the claimant's psychomotor retardation, he is limited to simple, unskilled work which involves average productivity requirements." *See id.* 19; 77-80. The expert explained that fast-paced tasks, tasks that frequently changed, or highly stressful tasks were inconsistent with average productivity requirements. *See id.* The ALJ adopted this finding as the "most informed." *See id.*

This adoption may implicitly address some of the functional factors in the "special technique," but without further elaboration, it does not convince the Court that the ALJ implicitly addressed all of them, as required. For example, a limitation to average productivity does not address daily living, social functioning, or episodes of decompensation. Such a limitation, even with the expert's elaboration, does not clearly account for persistence. Nor is it clear how such a limitation, without more, addresses Santore's particular difficulties in concentration and pace.

The failure to conduct a proper special technique analysis led to more problems later in the ALJ's inquiry. In his hypothetical to the vocational expert, the ALJ asked, "Based upon the residual functional capacities described by the doctors here today, would there be other work that such an individual would be capable of performing." Admin. R. at 79. The expert responded that Santore would be limited to "light, unskilled" jobs, such as a bindery operator, a housekeeper, or sorter. *Id.* But "[w]hen an ALJ poses a hypothetical question to a vocational expert, the question must include all limitations supported by medical evidence in the record. . . . More specifically, the question must account for documented limitations of 'concentration, persistence or pace.'" *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) (internal citations omitted). The ALJ's hypothetical fails to do so. In short, without a more elaborated discussion of the functional factors in the "special technique," "there is not an 'accurate and logical bridge' between the ALJ's recitation of the mental medical evidence and the decision to account for [Santore's] mental impairments by limiting him to unskilled work." *See Craft*, 539 F.3d at 677–78.

It is true that the residual functional capacity determination is the province of the ALJ. *See Armstrong v. Barnhart*, 287 F. Supp. 2d 881, 886 (N.D. Ill. 2003). But the ALJ does not have free reign. The ALJ must, implicitly or explicitly, discuss all the functional areas of the

"special technique" in formulating a claimant's residual functional capacity. *See Pepper*, 712 F.3d at 366. Here, the ALJ did not do so explicitly. And on this record, the Court concludes that the ALJ did not do so implicitly, foreclosing the argument that the ALJ's failure was harmless. Accordingly, the Court remands the decision to the ALJ for a more detailed and comprehensive evaluation of the "special technique" functional factors.

### III.    The ALJ's Consideration of the Treating Physicians' Opinions

Finally, Santore argues that the ALJ improperly rejected or discredited medical evidence from Santore's treating physicians, Dr. Erhardt and Dr. Neybert, because: (1) the ALJ erroneously concluded that the evidence was unsupported and inconsistent with other evidence; and (2) the ALJ's determinations that Santore was "stabilized" on medication and that Santore would have been hospitalized had his condition been as severe as reported by Dr. Erhardt were impermissible independent medical conclusions. In response, the Commissioner argues that this Court should affirm the ALJ's ruling because the ALJ was not required to give the opinions of Santore's treating physicians controlling weight, the ALJ appropriately discounted the treating physicians' opinions, and appropriately considered all of the medical evidence. Def.'s Opp'n 8–11.

Treating physicians' opinions are typically given more weight than evidence from other sources because they "provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations . . . ." 20 C.F.R. § 404.1527(c)(2). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed,

and the consistency and supportability of the physician's opinion." *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (quoting *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) and 20 C.F.R. § 404.1527(d)(2)). Ultimately, "[a]n ALJ must offer 'good reasons' for discounting the opinion of a treating physician." *Id.* at 739 (citing *Martinez*, 630 F.3d at 698).

The ALJ discounted the treating physicians' opinions because they differed significantly from other medical evidence in the record and were inconsistent with the treating physicians' own clinical records and notes. *See* Admin. R. 21. Here, the ALJ offered good reasons for finding the opinions of Dr. Neybert and Dr. Erhardt not fully persuasive because "if the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it." *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).

Starting with Dr. Neybert's opinion, the ALJ considered both evidence from Dr. Neybert, as well as the consulting experts, ultimately deciding that the opinions of the latter experts were "the most informed, consistent with the medical evidence of record, convincing, and consistent with the record as a whole." Admin. R. 19. This finding was based on analyses by the experts of what objective clinical evidence was available to the ALJ — this included x-ray studies, the pulmonary function tests, and internal medicine examinations finding Santore's impairment to be less severe than described by Dr. Neybert. *See id.* 19–20. In particular, the ALJ noted that an internal medicine examination predating Dr. Neybert's conclusions by seven months found far less impairment of Santore's ambulatory ability and grip strength compared to Dr. Neybert's assessment that Santore suffered from "severe arthritic pain." *Id.* 20.[3] The ALJ also found that a

---

[3] Santore argues that the ALJ's finding of statistical abnormality in his alleged arthritis constitutes another "improper independent medical assessment." Pl.'s Mot. Summ. J. 19. This finding of abnormality, however, goes more to the inconsistency between two sources of medical evidence—the internal medicine consultant and Dr. Neybert's opinion seven months later—as opposed to a freestanding

radiologist's report and recent testing of Santore's pulmonary function contradicted the severity of the impairments Dr. Neybert described. *See id.* 19. Accordingly, the ALJ properly discounted Dr. Neybert's opinion as a treating physician by citation to specific medical evidence inconsistent with Dr. Neybert's opinion.

As to Dr. Erhardt's opinion, the ALJ generally noted that reviewing mental health consultants and medical experts opinions significantly differed from those of Dr. Erhardt. *Id.* 18. The ALJ noted that the medical experts in psychology described a level of functioning at odds with, and higher than, that described by Dr. Erhardt. *Id.* 19. The ALJ also reasoned that Dr. Erhardt's own treatment notes did not provide support for Dr. Erhardt's opinions. *Id.* 20. These treatment notes described Santore as having been "stabilized" on psychotropic medication. *Id.* 20–21. On this point, the ALJ found an inconsistency between the patient's perception that his treatment was ineffective and Dr. Erhardt's conclusion that only chronic symptoms remained. *Id.* 21. Lastly, the ALJ noted that, after the hearing, a medical expert in psychology opined that Santore's symptoms actually more closely described a panic disorder, a condition medical sources, including Dr. Erhardt, failed to treat or even diagnose. *See id.* The ALJ therefore properly discounted Dr. Erhardt's opinion as a treating physician by citation to specific medical evidence inconsistent with Dr. Erhardt's opinion.

For his part, Santore argues that the ALJ did not address the factors outlined in *Scott*. But as the Commissioner points out, Santore "does not proffer any evidence concerning the[] factors [under 20 C.F.R. § 404.1527(c)] that would support a different outcome." Def.'s Opp'n 10. While Santore gestures at one factor — Dr. Erhardt's specialty as a psychologist, *see* Pl.'s Mot. Summ. J. 18 — Santore provides no citations to the record or additional evidence bearing on this

medical judgment made by the ALJ. *See* Admin. R. 20. Such weighing of the evidence by the ALJ is appropriate.

point, and he makes no argument concerning how Dr. Erhardt's specialty would support a different conclusion had the ALJ considered it.

Santore also argues that the ALJ found that "Dr. Neybert's records . . . are often illegible," *see* Admin. R. 19, but failed to follow-up to clarify the illegible records. Social Security Ruling 96-5p ("SSR 96-5p") requires that "if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion." SSR 96-5p. However, the ALJ also found some of the records were legible, and the ALJ's analysis of the conflict between the legible portions of Dr. Neybert's records and other medical evidence in the record properly allowed the ALJ to discount the treating physician's opinion. *See* Admin. R. 19 ("[A]nd what is legible does not document clinical findings consistent with [Dr. Neybert's] opinions.").

Lastly, Santore's remaining challenges to the ALJ's consideration of these opinions does not change this Court's analysis. The ALJ found Dr. Erhardt's opinions unconvincing in part because the ALJ felt that the severity of the impairments and "dysfunction[]" described would have required more aggressive residential or hospital treatment. *See Id.* 21. It is important to note that an ALJ may not "impermissibly 'play[] doctor' and reach[] his own independent medical conclusion" in determining that the level of treatment received fails to show limitations beyond those described. *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009). The ALJ also found that Santore "ha[d] been stabilized through effective [outpatient] treatment" based on sporadic episodes of sociability and productivity, including that Santore had experienced intermittent "moments" of optimism and occasional "good days." Admin. R. 21. This may have

constituted impermissible "cherry-picking" of the record. *See Scott*, 647 F.3d at 740. But again, in the presence of the ALJ's legitimate reasons for discounting the treating physicians' opinions, these potential errors do not require remand because the grounds on which the ALJ discounted the treating physicians' opinions are sufficient and independent. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("[W]e will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result.").

## Conclusion

For the reasons discussed herein, the Court grants Santore's motion for summary judgment [22] in part and remands for further proceedings. The Court finds that the ALJ's credibility finding and discounting of the treating physicians' opinions were proper and find sufficient support in the record. But the ALJ committed legal error in failing to perform the proper special technique analysis for Santore's claimed mental impairment. Consequently, this Court will reverse the decision of the Commissioner and remand to the Social Security Administration for further proceedings consistent with the Court's Memorandum Opinion and Order. Civil case terminated.

**SO ORDERED**                    **ENTER: 4/28/15**

_____
**JOHN Z. LEE**
**United States District Judge**